**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Criminal Action |
| ) | No. 06-03090-CR-S-DW |
| SCOTT E. KISSEE, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

Defendant has filed a Motion to Suppress Evidence in which he alleges that evidence seized from his residence on October 23, 2004, should be suppressed because the law enforcement officers conducted an illegal search. The government filed its response. A hearing was held before the undersigned on April 12, 2007. Defendant was represented by counsel, Steven S. Meier, and the government was represented by Christopher M. Nielson, Special Assistant United States Attorney.

Sean Vorse, of the Ozarks Police Department, first testified for the government. He was contacted by the Missouri Department of Family Services ["DFS"] regarding a hotline call about a possible methamphetamine lab and firearms at a residence in Ozark. He proceeded to 1007 S. 6th Street in Ozark, accompanied by several other officers. The residence was believed to be defendant's home. Another officer, Corporal Jackson, knocked on the door. Shortly thereafter, defendant appeared, coming around the corner of the house. Officer Vorse was present for part of the conversation with defendant and Corporal Jackson, and he heard defendant consent to a search of the residence. He then entered into the residence, and noticed a vinegary-type odor. Officer

1

Vorse, who has received training in the detection of methamphetamine and items associated with its production, observed, in plain view, items consistent with the manufacture of methamphetamine. Specifically, he saw a glass tube, a bench with a hot plate, and plastic tubing in a closet where the doors were open. The officer also noticed that there was a blanket covering the window. Upon entry, defendant directed him to the children's bedroom. When he checked on the children, he was with Lynn Gamache of DFS. After finding the children okay, they proceeded to the living room, where defendant was sitting with other officers, who were talking to him. Officer Vorse did not speak to defendant and didn't read him his rights. He didn't observe anything else in the residence consistent with the production of methamphetamine. After the search warrant was obtained, he stayed outside the residence to keep it secure. No search was conducted during that time.

The officer, on cross examination, stated that he and about five other officers met at the Ozark Police Department regarding checking on the well-being of defendant's children. He does not recall if he did anything to verify who lived at the residence or otherwise conducted any kind of records check. When they got to defendant's residence, he arrived by himself, and all the officers, who arrived individually, approached the residence together. He admitted that he did not hear all of the conversation between defendant and Corporal Jackson. Regarding hearing defendant give consent, he does not recall the exact conversation. Officer Vorse stated that he could not testify specifically testify to defendant giving consent to go into the residence. When they checked on the children, they appeared safe and sound. He did not believe that anyone began to search the residence at the time they were checking on the children. He did not recall whether the closet doors were open when he first went into the residence. He was pretty sure he smelled the odor of vinegar, but through his training and experience, vinegar has not been related to the manufacture of

2

methamphetamine. He also stated that the other officers advised defendant that law enforcement was there to check on the welfare of the children, as well as to advise him of the report of a methamphetamine lab and firearms.

On redirect, the officer stated that when he first made contact with defendant outside of the residence, he did not recall if heard defendant grant consent. He has in his report that Corporal Jackson <u>Mirandized</u> defendant, but he was not present for that.

The government next called Corporal Shonda Jackson of the Ozarks Police Department. She stated that she was contacted by Ms. Gamache from DFS, who told her that she had information that defendant's three children were in danger because he'd been manufacturing methamphetamine, and because there were numerous firearms in the residence. When the officers arrived at the residence, Corporal Jackson was the one who knocked on the door. She wasn't sure if she announced their presence, but she knocked for about one minute. Defendant came outside from a different door, and she explained why they were there. Specifically, she advised him about the information they'd received from DFS. She asked if they could come inside and check on the children, whom he said were inside sleeping. She then asked if they could go inside and check on the children, and he said they could. It was her opinion that defendant was of reasonable intelligence and did not appear to be under the influence of drugs or alcohol. He wasn't read his rights then and he was free to leave. She did not know if he'd had prior contact with law enforcement. He was outside, no threats or promises were made to garner consent, and they'd only been talking for about 30 seconds. She did not place him in custody at the time he granted consent. He said something general like "okay," and it was more than a nod of the head. Once he granted consent, she proceeded into the residence. She, too, has been trained in the detection and manufacture of methamphetamine. She observed

3

what appeared to be a webcam on the outside of the curtains. When she entered the residence, she smelled a strong vinegar odor and another odor she couldn't identify. There were thick blankets over two windows. Once inside the residence, she observed, among other things, a large baking dish with a semi-clear fluid and a pasty white substance in it, a large crock pot with some liquid and residue, a hot plate, and a small measuring flask on the dresser. When she went to briefly check on the children, she had defendant accompany her, as she was not comfortable going into dark rooms alone. She then asked Officer Vorse and the DFS officer to check on the children. In passing the kitchen, she saw chemical bottles on the cabinet, mason jars on a dish drainer, and zip lock bags. While the other officers were in the back checking on the children, she observed defendant trying to get into a closet. When one of the other officers stopped him and asked him to have a seat, he "started spinning around in circles like he was confused as what to do." [Tr. 24]. Once he finally sat down, Officer Roderick checked the closets to make sure there weren't any weapons or person hiding. She observed some camping fuel and clear tubings in the closets. Corporal Jackson then asked defendant if he would consent to a search of the residence, and he said, "No." He wasn't free to leave at that point, based on what they had observed in the residence. Once defendant refused consent for a further investigation of the residence, Corporal Jackson advised him of his <u>Miranda</u> rights, and then Officer Whitehill took over the investigation of the methamphetamine lab. She then handcuffed him and transported him to the Christian County Jail.

On cross examination, Corporal Jackson testified that she didn't do any checking to confirm the address or conduct any background check on defendant. She testified that there were six officers and the DFS worker there. They all arrived in separate patrol cars, and all the officers with the Ozarks Police Department were there that night. Upon contact with defendant, she advised him that

4

they were there to check on the children; she didn't mention the methamphetamine or firearms. He told her the children were asleep in the residence. He didn't ask her why they were checking on the children's welfare. Corporal Jackson did not remember if they told him that DFS was there. She just recalls that he gave a verbal consent to go inside to check on the children, but does not recall his exact words. They'd been talking about 30 to 60 seconds before he gave consent. She did not advise him that he could go back inside, why they were there, or that he could deny consent to go inside. He could have refused consent. The officer denied that they intended to get into the house "at all costs." [Tr. 30]. There appeared to be a webcam in the window with a wire through the curtain. Regarding the smell of vinegar, she is not familiar with vinegar being used in the production of methamphetamine. She wasn't sure if she asked if anyone else was there except for the children. Regarding reading him his rights, Corporal Jackson acknowledged that she had previously testified in state court hearings that she did not remember if she read him his rights. Now, she has refreshed her recollection by reviewing the reports further, and is sure that she <u>Mirandized</u> him. Corporal Jackson explained that she couldn't remember if it was her or Officer Whitehill who had read defendant his rights. She also admitted that she had had other opportunities to review her reports, and explained that she did not document this information in her own report. Officers Vorse and Whitehill were around at the time she advised defendant of his rights, and Officer Roderick may have been in the room. She wasn't sure about several other officers being there.

The government next called Officer Jared Roderick of the Ozarks Police Department. He also was there at defendant's residence on October 23, 2004, and went into the residence, based on his belief that defendant had given consent. He looked in a closet because defendant had been

5

making some odd movements towards the closet door. Officer Roderick decided to do a safety sweep to protect himself and others, based on the information they'd received about methamphetamine and firearms. Once he opened the closet doors, he observed items consistent with methamphetamine production, including rubber hosing, a torch, and coffee filters. He didn't move anything. He only looked in this one closet, although there was another partially-opened closet, where he didn't observe anything. He never spoke to defendant.

On cross examination, the officer testified that he was on duty that morning, and went to the residence in his own patrol car. He did not do any background checking. When he went inside, other officers had already entered the residence. He stayed by the door, while everyone inside went to the back area. He had no knowledge that defendant was under arrest. Regarding the nervous actions made by defendant, he explained that defendant was in the living room area, and immediately went towards the closet where the door was ajar and began reaching towards it. He was told to have a seat, but he began turning, at least one complete circle, looked around, and paused before he actually sat down in the chair that was right there beside him. Officer Roderick had no knowledge of anyone else being in the residence except for the children. He was not involved in the arrest of defendant. He admitted that defendant did not personally give him permission to look in the closet or to go into the residence.

The next witness for the government was Officer Jeremy Whitehill of the Ozark Police Department. He conducted a safety search of the entire residence, based on the information regarding a methamphetamine lab and firearms, to secure the scene for both the officers and the public. When he got there, he noticed a pungent smell. At the time he conducted his safety search, he believed defendant was detained. He observed a pyrex dish with liquid, a torch, residue in a dish,
6

coffee filters, glassware, camping fuel, and an electric burner, among other items. The items were in plain view, and were consistent with the manufacture of methamphetamine. He did not <u>Mirandize</u> defendant when he spoke to h im. He believed another officer had read him his rights. He asked about the pyrex dish with the white fluid by the computer, and defendant said he used it to soak his feet. He also said he used vinegar to clean his floor. He stated that he did not have a coffee maker. When asked by Officer Whitehill, defendant said there were no illegal items in the house. The officer asked for consent to search for contraband, advised him that his cooperation would be appreciated, but that he had the right not to cooperate, and that he would seek a search warrant. He did make a statement to defendant to the effect that they both knew what he would find, at which point, defendant shook his head up and down in what looked like a "yes" in the officer's opinion.

Officer Whitehill was the affiant for the search warrant that was then sought. State Court Judge John Waters signed it. The judge requested some clarification, so the officer hand wrote some notations on the affidavit, which were written before the search warrant was obtained. Because it was late at night, he was unable to retype the affidavit. Among the items found were a flask, numerous pyrex dishes, an electric burner, Coleman fuel, washer fluid, zip lock baggies, glass pipes with burn marks, rubber tubing, muriatic acid, acetone, and other items consistent with the production of methamphetamine. The officers also found a pistol, a shotgun, a rifle, and other weapons.

On cross examination, Officer Whitehill also stated that he did not do any records checking before he proceeded to the residence that night. He was with Corporal Jackson, but did not believe he was present when she interviewed defendant. He believed that it was her function to inform him that they were checking on the well-being of the children. His recollection was that as soon as they

7

entered the house, they conducted a protective sweep. During the briefing, he recalled the mention of weapons and a surveillance camera. That's all he remembered. He was not present when defendant received his Miranda warnings, but he believed Corporal Jackson advised him that she had read defendant his rights. He does not remember being present when defendant consented to the search. He stated there were five to seven officers and DFS there. He was not aware that defendant was ever threatened that his children would be taken.

Defendant testified on his own behalf. He remembered Officers Jackson, Gamache, Whitehill, and several other officers. It was about 12:30 a.m. when they all arrived at his home. Just his children were at the residence with him. The officers didn't ask him if anyone else lived there or was present there. He stated that Corporal Jackson told him that they were there to check on the welfare of the children, and he said they were asleep and were fine. She stated they really need to check on the children, so he said "okay." He never heard them knock, but was taking his trash out, when he saw the officers outside and around his residence. Other officers were present when he had the initial contact with Corporal Jackson. She did not advise him about the methamphetamine and firearm information when she first talked to him. She did not advise him that he had the right not to consent. All he said was that it was okay to check on the children. He did not give consent to search the residence, and he did not feel free to leave. When they went inside, he led the way, with a lot of officers present. The house was small. Blankets were over the windows because the room was a bedroom for one of his roommates. He knows what Miranda is, but he has never been arrested before, and no one advised him of his rights. He knew by the sheer number of officers that they were there for a purpose and that "there was nothing that I was going to say that was going to prevent them from going into the house, so." [Tr. 66]. They advised him that the DFS

officer, Lynn Gamache. was there, but he never had a conversation with her. He never gave anyone permission to open any closet doors, go inside drawers or cabinets, or move any items. He was taking a lot of medicine and was under the influence of medication prescribed by a physician. That might have affected his decision making. He also thinks his MS would influence his decision-making ability.

On cross examination, defendant testified that he was the sole resident at that residence on that day, but he had had two female roommates, who had recently moved out. When the officers arrived at the residence, he was taking out the trash. Only Corporal Jackson contacted him directly, although there were several other officers within 10-15 feet of him, as well as in the yard. At this time, defendant was 33 years old, had a GED diploma, had attended college courses in the service, and admitted that he has full capability to understand what was going on. He was taking Valium and Diazepam, which he was taking according to directions. Although he felt he was under the influence of medication, he was able to understand events as they occurred. He understood, through her words and body language, what Corporal Jackson was saying. She spoke to him for a minute to a minute and a half. He felt threatened by the numbers of police officers, and although she didn't threaten him physically, she intimidated him, and the other officers stared at him. The porch light was on, so this was noticeable. In the conversation with Corporal Jackson, she didn't threaten him or his children, and did not threaten to take his children away. She did not promise him anything. He would not consider himself free to leave, although no one had told him he wasn't free to do so. No one had drawn a firearm or handcuffed him. He actually led them inside the residence. There was a web camera in front of the east window, which was where he moved the computer that day. He had no idea if a person could see outside with the camera. Defendant acknowledged that he

9

accompanied the officers when they went to check on his children. Regarding his actions in the living area, he lost his balance when he stepped off a step, which caused him to stumble somewhat. The officers told him to sit down, which he did. Although defendant testified that he did not recall if Corporal Jackson read him his rights, he admitted that someone did. He acknowledged talking to Officer Whitehill about some of the items that were seen, but does not remember what he said. He stated that he just nodded his head in response to Officer Whitehill's statement that they knew what they would find if they searched the residence because Officer Whitehill was nodding his head. He told the officers that the substance in the baking dish was foot soap, and that he mopped the floor with vinegar.

Defendant contends that the evidence should be suppressed because the officers did not have a legitimate right to enter the residence. He states that he was contacted outside of his residence, and that a protective sweep was not justified because they no probable cause to arrest him, nor was he placed under arrest. Further, he contends that the officers did not articulate what danger they might have been exposed to. Defendant also argues that the evidence should be suppressed because he did not give consent to search his residence, but if he did, his consent was not freely and voluntarily given based upon several factors, including the presence of seven law enforcement officers, the time of day, the deception on the part of the police, the lack of information that the children were in danger, and the fact the was not informed that he could refuse entry.

The government maintains that Corporal Jackson received knowing and voluntary consent from defendant to enter the residence; once the officers lawfully entered the residence, they observed items consistent with the manufacture and possession of a controlled substance in plain view and then conducted a protective sweep. Once these were observed, the government states that

10

the officers obtained a search warrant, which sets forth the evidence of criminal activity observed in defendant's residence.

The Eighth Circuit has relied on a number of factors to determine whether consent to search is voluntary. United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990). Some of the factors relating to the person giving consent include age, general intelligence and education, prior experience with law enforcement, and whether he or she was under the influence of drugs or alcohol. See United States v. Mancias, 350 F.3d 800, 805 (8th Cir. 2003) (internal citations omitted). Conduct of law enforcement to be considered includes the length of the detention, whether there was physical intimidation, if the defendant was in custody or under arrest, if the police made promises or misrepresentations, if the interrogation was in a public place, and whether the accused objected to the search or stood by silently. Id.

Based on the testimony of the witnesses regarding the entry into defendant's residence, the Court finds that defendant was not illegally coerced into giving consent. This conclusion is based on a full review of his testimony, together with the testimony of Corporal Jackson, and Officers Vorse, Whitehill, and Roderick. The officers told defendant that they had received a call about his children, and they were concerned about their well-being. They informed him that they wanted to see the children, which was a reasonable request under the circumstances. The law is clear that the proper focus is the totality of the circumstances, including the characteristics of the person consenting and the environment in which consent is sought. Mancias, 350 F.3d at 805. In this case, it cannot be said that defendant, based on the totality of the circumstances, did not voluntarily consent, based on his degree of education, general level of intelligence, and his own testimony regarding the night in question. While defendant stated that he did not know he could refuse

consent, he did not testify that he was afraid or overwhelmed into giving consent. His testimony did not indicate that concern about losing his children caused him to let the officers come in. There is no evidence to suggest that the officers strong armed hin and/or employed coercive tactics that would have overborne his ability to make a voluntary decision. Defendant himself acknowledged that the only thing intimidating about the situation was that there were a number of officers there. He admitted he was never threatened in any way, nor was he made any promises regarding what might happen if he did not give consent. He denied that he was ever threatened with his children being taken away if he did not consent. All the officers who testified stated that they did not threaten or coerce defendant. They stated that he appeared to be of at least average intelligence, and did not appear to be under the influence of drugs or alcohol that would have adversely affected his ability to give full, knowing consent. Defendant's meager attempt to suggest that his decision-making ability might have been affected by the prescription medication he was taking was simply not believable. Despite the fact that it was just after midnight when the officers arrived, defendant testified that he was going outside to empty the trash; therefore, it cannot be seriously argued that he might have been asleep or otherwise not fully aware of what was going on. By his own testimony, defendant demonstrated at least average, general knowledge of how law enforcement officers function. There was no testimony that guns were ever drawn or that defendant was in any manner physically intimidated. Although there was more than ample testimony elicited regarding the fact that the officers arrived in their individual vehicles, and that there were six to seven of them on the scene, other than the numbers themselves, there was nothing to suggest that the situation was so oppressive that a person of average intelligence and ability would have felt unduly threatened. In fact, the testimony was consistent that only one or two officers talked to defendant at a

12

time–mainly, just Corporal Jackson and Officer Whitehill–and that the other officers were at least 10 to 15 feet, or further, away. Additionally, defendant not only let the officers come into his home, he accompanied them to the back of the house where the children were sleeping. Based on the totality of the circumstances, the Court finds that there is no evidence that defendant was coerced or otherwise forced under duress to give his consent for the officers to enter his home. It should also be noted that, by defendant's own admission, he was read his Miranda rights. Accordingly, there is no basis to suppress the evidence on this ground, as defendant's consent was knowing and voluntary.

The law is clear that law enforcement officers may conduct a protective sweep to protect the safety of the officers and others. Maryland v. Buie, 494 U.S. 325 (1990). In this case, the officers had reasonable suspicion, based on what they had seen in plain view, to support safety concerns that justified walking through defendant's house without a warrant to ensure the safety of whomever else might have been in the house, as well as themselves and the general public. Regarding the scope of the protective sweep of the residence, it is clear that the officers were justified in conducting that cursory search for their own safety, as well as that of the children and general public. They had information regarding a possible methamphetamine lab on the premises, as well as the alleged presence of firearms. Immediately upon entering the house, they saw items in plain view that were consistent with the production of methamphetamine. The fact that most of the items were in plain view was never challenged or contested by defendant. Based on the credible testimony from the officers, the Court concludes that the items seen in the closet were either viewed through an open door or were viewed because defendant tried to get into the closet. Such actions clearly created an exigent situation under the circumstances, which would compel the officers to

13

look inside for safety reasons. Even though they testified that one might not connect the smell of vinegar with methamphetamine production, there were clearly other indicia of that activity in plain view. In this case, it is important to be aware that the officers were called by a state agency with a request to assist in checking on the welfare of children because DFS had received a hotline call. That call indicated that the children might be at risk because of a possible methamphetamine lab and firearms in the residence where they lived. Once the officers were lawfully inside, the evidence clearly indicates that they quickly saw numerous items in plain view, as they were walking towards the bedroom, that were consistent with methamphetamine production. Accordingly, not only were they legally justified in conducting a protective sweep of the premises, it could be argued that they would have been derelict in their duties had they not conducted a protective sweep of the residence. The officers testified, moreover, that they did not know if there were other individuals on the premises who might have exacerbated the obvious risk already present. Finally, the Court must be mindful that once defendant was specifically asked if the officers could continue their search, he said they could not. Not only does this demonstrate his ability to refuse consent when he chose to do so, it also demonstrates the veracity of the officers' testimony that their search was limited in scope to a protective, safety-based sweep of the premises. Therefore, the Court finds that this argument also fails, and that the motion to suppress should be denied on the basis of an illegal search as well.

For the foregoing reasons, it is, pursuant to the governing law and in accordance with Local Rule 72.1 of the United States District Court for the Western District of Missouri,

RECOMMENDED that defendant's Motion to Suppress Evidence be denied.

/s/ James C. England
JAMES C. ENGLAND, Chief
United States Magistrate Judge

Date: 05/01/07